**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

_____

| | |
|---|---|
| SECURITYNATIONAL MORTGAGE, | : |
| COMPANY | : |
| | : Civil Action No. 4:17-cv-2726 |
|         Plaintiff, | : |
| v. | : Judge |
| | : |
| EUSTIS MORTGAGE CORPORATION; | : JURY TRIAL DEMANDED |
| DONALD P. GOTHARD and | : |
| DEBRA M. FITZGERALD | : |
| | : |
|         Defendants. | : |

_____

**VERIFIED COMPLAINT, INJUNCTIVE**
**RELIEF REQUESTED, AND DEMAND FOR JURY TRIAL**

      Plaintiff, SecurityNational Mortgage Company, by its undersigned counsel, hereby files

this Verified Complaint seeking temporary, preliminary, and final injunctive relief, monetary

damages, and such other relief as the Court deems appropriate, against Defendants Donald

("Donny") P. Gothard, Debra M. Fitzgerald and Eustis Mortgage Corporation for violations of

the Lanham Act, Defend Trade Secrets Act, misappropriation of trade secrets under federal and

state law, common law claims of unfair competition and tortious interference, and breaches of

contract and fiduciary duties.

**Statement of the Case**

      SecurityNational Mortgage Company ("SNMC") brings this action against its former

employees, Donald ("Donny") P. Gothard (hereinafter "Defendant Gothard") and Debra M.

Fitzgerald (hereinafter "Defendant Fitzgerald") (collectively the "Employee Defendants"), and

Eustis Mortgage Corporation ("Eustis" or "Defendant Eustis") pursuant to the Lanham Act, 15

U.S.C. § 1125 _et seq._, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 _et seq._, and

related state law claims, seeking injunctive relief and substantial damages.  The Employee

Defendants surreptitiously orchestrated a plan in which they resigned from SNMC in succession and joined Eustis, laying the groundwork for their departures by stealing a substantial amount of confidential and private information from SNMC—and SNMC's consumers—while in SNMC's employ, and diverting that information, SNMC's consumers, and loans in process to Eustis.  In addition, in the weeks preceding the Employee Defendants' departure from SNMC, they intentionally misinformed consumers, referral sources and others in the industry that SNMC was merging with Eustis.  Eustis used SNMC's employees, including the Employee Defendants, as its agents to undermine and severely damage SNMC, effectively close down SNMC's Houston office and unfairly gain a competitive advantage.  Defendants' actions were illegal and have caused substantial injury and continue to cause irreparable harm to SNMC. In support thereof, Plaintiff avers as follows:

## Parties

1.      Plaintiff SNMC is a corporation organized and existing under the laws of the State of Utah with its principal place of business located in Salt Lake City, Utah.

2.      Defendant Gothard is an adult individual and resident of the State of Texas. Defendant Gothard was employed by SNMC as the Branch Manager and loan officer, in the office located at 16350 Park Ten Place, Suite 202, Houston, Texas 77084 ("SNMC Houston Branch").  Defendant Gothard had access to SNMC's business plans, marketing relationships, borrower lists and information, including confidential, nonpublic borrower documents and loan applications, and other trade secrets, and was in a position of trust and confidence with respect to such information and the SNMC employees which he supervised.

3.      Defendant Fitzgerald is an adult individual and resident of the State of Texas. Defendant Fitzgerald was employed by SNMC as the operations manager and loan officer in the SNMC Houston Branch.   Fitzgerald had access to SNMC's business plans, marketing

2

relationships, borrower lists and information, including nonpublic, confidential borrower documents and loan applications, and other trade secrets, and was in a position of trust and confidence with respect to such information and SNMC employees.

4.      Defendant Eustis is a corporation organized and existing under the laws of Louisiana with a principal place of business at 2525 Energy Center, 1100 Poydras Street, Suite 2525, New Orleans, Louisiana 70163-1139.   Eustis is a direct competitor to SNMC in the mortgage lending industry and now has an office in Houston, Texas under the name Verity Mortgage.

<u>**Jurisdiction and Venue**</u>

5.      Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §§ 1331 and 1367 as the claims arise under the laws of the United States.

6.      In the alternative, jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the citizenship of Defendants is diverse from that of the Plaintiff.

7.      This Court has personal jurisdiction over Employee Defendants because they are residents of the State of Texas.

8.      This Court has personal jurisdiction over Eustis because of its intentional contacts with the State of Texas. Specifically, Defendant Eustis has continuous and systematic contact with Texas and regularly conducts business in Texas through its offices in Houston, Stafford and McAllen, Texas. In addition, Eustis has contacts arising from Plaintiff's causes of actions whereby Eustis intentionally engaged in tortious conduct aimed at the State of Texas.

6302231v1

9.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims asserted herein occurred in this District, and Defendants are subject to jurisdiction in this District.

**Factual Allegations Common to All Counts**

10.     SNMC is a mortgage lender that offers a variety of purchase and refinancing programs tailored to fit the needs of its borrowers and that specializes in growth through consumer and industry relationships and referrals.

11.     In March 2015, Defendant Gothard and Defendant Fitzgerald began their employment at SNMC.  Defendant Gothard was the Branch Manager of the SNMC Houston Branch and a loan originator, and Defendant Fitzgerald was the Operations Manager of the SNMC Houston Branch and a loan originator.

12.     In December 2015, as a condition of their continued employment, SNMC required the Employee Defendants to sign employee agreements containing confidentiality covenants, as well as separate non-disclosure agreements, to protect SNMC's confidential and proprietary information, as well as its relationships with employees and consumers.

13.     Defendant Gothard executed an Outside Loan Originator agreement, dated December 21, 2015 (the "Gothard Loan Originator Agreement"), which is attached hereto and incorporated herein as **Exhibit 1**.   The Gothard Loan Originator Agreement contains a confidentiality clause, which provides in pertinent part:

> Originator acknowledges that by reason of Originator's relationship with SNMC, Originator will have access to information and materials concerning SNMC's: processes, technology, products, borrowers, loan applicants, loans in process, and borrowers' and prospective borrowers' loan applications, records documents and other information (hereinafter "Confidential Information"). Originator acknowledges that all Confidential Information is of substantial value to SNMC. Originator agrees to not disclose, or utilize in any manner, any Confidential Information, except only as necessary in the origination of a loan by or through SNMC. Originator agrees to abide by Security National Financial

4

Corporation's and SNMC's privacy policies and all other laws, rules, regulations and policies pertaining to the protection of financial privacy and non-public information. Originator's promises, duties and obligations set forth in this Agreement shall survive any termination of Originator's employment. Originator agrees that any disclosures or use of any Confidential Information, except only as specifically permitted in this Agreement, will result in irreparable injury and harm to SNMC, for which there is no adequate remedy at law. Originator agrees that, in addition to SNMC's other remedies, SNMC may apply for and obtain injunctive relief prohibiting and enjoining any breach by Originator of originator's promises, duties and obligations set forth in this Agreement.

(Ex. 1 ¶ 7.)

14.    In addition, on March 21, 2015, Defendant Gothard signed a Non-Disclosure Agreement ("Gothard Non-Disclosure Agreement"), which is attached hereto and incorporated herein as **Exhibit 2**.  The Gothard Non-Disclosure Agreement provides in pertinent part:

[Gothard] hereby agrees and acknowledges: That during the course of my employ there may be disclosed to me certain trade secrets or proprietary materials or other confidential information of the Company; said trade secrets or proprietary materials or other confidential information consisting of, but not necessarily limited to: Technical information:  Methods, processes, formulae, systems, techniques computer programs, source codes, system documentation. Business information:  Customer lists, agent lists, pricing data, financial or marketing data.

(Ex. 2 ¶¶ 1a-1b.)

I agree that I shall not during, or at any time after the termination of my employment with the Company, use for myself or others, or disclose or divulge to others, any trade secrets, confidential information, or any other proprietary materials of the Company in violation of this agreement.

(Ex. 2 ¶ 2.)

That upon the termination of my employment from the Company:
a) I shall return to the Company all documents and property of the Company, including but not necessarily limited to: reports, manuals, correspondence, customer lists, agent lists, computer programs, system documentation, source codes, and all other or proprietary materials and all copies thereof relating in any way to the Company's business, or in any way obtained by me during the course of employ. I further agree that I shall not retain copies, notes or abstracts of the foregoing.
b) The Company may notify any future or prospective employer or third party of the existence of this agreement, and shall be entitled to full injunctive relief for any breach.

c) This agreement shall be binding upon me and my personal representatives and successors in interest, and shall injure [sic] to the benefit of the Company, its successors and assigns.

(Ex. 2 ¶¶ 3a-3b.)

15.     Further, as the Branch Manager, Defendant Gothard was given authority to supervise the employees at his branch, facilitate and enforce SNMC's policies and protect the company from violations of laws.  In giving Defendant Gothard this authority, SNMC put its utmost trust in him to act at all times in the company's best interest.

16.     Defendant Fitzgerald also executed an Outside Loan Originator Agreement, dated January 14, 2016 ("Fitzgerald Loan Originator Agreement"), which is attached hereto and incorporated herein as **Exhibit 3**.  This agreement contains the same confidentiality clause as the Gothard Loan Originator Agreement, quoted in paragraph 15.

17.     Similarly, Defendant Fitzgerald also signed a non-disclosure agreement, dated March 18, 2015 ("Fitzgerald Non-Disclosure Agreement"), which is attached hereto and incorporated herein as **Exhibit 4**.  This agreement contains the same language as the Gothard Non-Disclosure Agreement, quoted in paragraph 16.

18.     In addition to the contractual obligations owed to SNMC, the Employee Defendants had statutory and common law obligations to comply with their fiduciary obligations and duties of loyalty to SNMC while they were employed by SNMC (and receiving significant compensation therefor) and were legally obligated to protect SNMC's trade secrets and the private information of SNMC's consumers.  The Defendants similarly had common law and statutory duties not to encourage, aid or abet employees to steal SNMC's trade secrets or breach their fiduciary obligations to SNMC or to unfairly compete with SNMC.

19.     The Employee Defendants, while employed by SNMC, worked in the SNMC Houston Branch along with five (5) other employees.  As branch manager, Defendant Gothard was entrusted by SNMC with the supervision of: Defendant Fitzgerald, Operations Manager; Tammy Garofano, Loan Originator Assistant; Ava Tsui (goes by surname "Nguyen"), Account Executive; Jodie Orlando, Loan Processor; and Teresa Valentino, Loan Processor.  All of these employees had access to SNMC's most sensitive data and programs.

20.     The Employee Defendants were entrusted with SNMC's leads, customer loan applications, marketing strategies, consumer and loan lists, consumer identifying and financial information and pricing information, and were expected to use such resources to originate loans to be funded by and through SNMC.  Moreover, such information was to be maintained exclusively for SNMC's benefit and was not to be disclosed outside of SNMC.

21.     A consumer who is using or considering using SNMC's services provides SNMC with a wide variety of personal and confidential information, including Social Security numbers, dates of birth, contact information, sensitive credit history, wage statements, bank account numbers, mortgage amounts, tax returns, and all the financial information that is necessary to facilitate a home loan.

22.     SNMC's potential consumers provide this confidential information to SNMC with the understanding that SNMC will protect this highly private information.  SNMC is required to maintain the privacy of this information by extremely strict federal laws that carry substantial penalties if violated, such as the Gramm-Leach-Bliley Act.

23.     SNMC does not release, share, or disclose such confidential information to the general public.  SNMC maintains the secrecy of this confidential information and derives an economic and competitive advantage from maintaining the security of such information.  If a

7

competitor obtained this information, it could undercut SNMC on SNMC's loans and divert SNMC's consumers by aggressively pursuing those consumers based on the information kept by SNMC.

24.     In fact, SNMC has specific privacy policies that delineate how SNMC collects and stores consumer nonpublic personal information ("NPI"), which are attached hereto and incorporated herein as **Exhibit 5 and Exhibit 6**.

25.     SNMC's policies describe in detail how SNMC gathers and shares consumer NPI and how that consumer NPI is protected and safeguarded.  (Ex. 5 p. 1.)

26.     SNMC "provides consumers the opportunity to opt out of sharing nonpublic personal information subject to certain limitations."  The procedure for affording consumers the option of opting out of certain disclosures is set forth in detail and there are no exceptions to complying with it.  (Ex. 5 p. 1.)

27.     Mortgage companies typically utilize a system called "Encompass," (or similar systems) to input borrower information and upload documents.  SNMC uses this system exclusively and its policy states "[a]ll consumer information will be stored in Encompass. Systems such as Dropbox are not allowed." (Ex. 6 p. 3.)

28.     SNMC also has a specific email policy. It states "[a]ll business will be conducted through company email; it is not acceptable to auto-forward company email to a personal email account."  (Ex. 6 p. 3.)

29.     The policy also states "[a]ll disclosures, borrower documentation, or other documentation that contains consumer information will only be distributed through Encompass." (Ex. 6 p. 3.)

30.     Defendant Gothard received training on these policies, which he completed on November 15, 2016.  Defendant Fitzgerald also received training on these policies, which she completed on March 28, 2016.

31.     However, Defendant Gothard saved and instructed his subordinates to save consumer NPI onto an unprotected external hard drive that the employees at the SNMC Houston Branch referred to as the "R Drive."

32.     All of the consumer NPI that Defendant Gothard and the SNMC Houston Branch acquired since 2015 is on the "R Drive."  No information is ever purged from the "R Drive." This information includes, but is not limited to, consumers' social security numbers, W2 forms and other wage statements, tax returns and bank and other financial statements.

33.     Because SNMC Houston Branch employee Teresa Valentino processed loans for other SNMC branches, she received NPI for individuals who were not going through Defendant Gothard, or anyone in that office, for a loan.

34.     Despite the lack of connection to Defendant Gothard, Defendant Gothard would ask Ms. Valentino for the consumer's NPI and documents that she was processing for other Branch Managers and/or Loan Originators.  Because Defendant Gothard was her supervisor, on a few occasions, Ms. Valentino provided this information, which was similarly loaded by or on behalf of Defendant Gothard onto the "R drive."

35.     With respect to the specific type of business conducted at the SNMC Houston Branch, most of the loans the office closed were for residential investment properties that required significant renovations.

36.     Typically, after a borrower identified a home that the borrower wished to purchase, and provided the borrower met certain criteria, SNMC would provide the borrower with a pre-qualification letter.

37.     Then, the borrower would obtain a short-term loan from a third party, short-term lender, to purchase and rehabilitate the property.  Once the renovations were completed or close to completion, SNMC would close a permanent refinance transaction on the property, which would pay off the short-term lender's lien.

38.     The primary source of borrowers for the SNMC Houston Branch was LifeStyles Unlimited International ("LifeStyles").  LifeStyles is an education and mentorship group for real estate investors.  SNMC is a preferred permanent lender for LifeStyles and is listed on LifeStyles's vendor webpage.  This listing, as well as the contact information and reviews associated with it, is important for business as LifeStyles members frequently utilize the listed vendors, rather than independently finding a lender.

39.     Tammy Garofano, an SNMC employee and Loan Originator formerly under Defendant Gothard's supervision, is also a member of LifeStyles. Ms. Garofano went to most of LifeStyles's monthly meetings, in her capacity as a member as well as a representative of SNMC.  These meetings, through Ms. Garofano's attendance, were the primary source of business for the SNMC Houston Branch.

40.     After approximately two years of employment with SNMC, on or around April 10, 2017, Defendant Gothard began secret discussions with Defendant Eustis to leave SNMC and work for Eustis.

10

41.     On or around April 11, 2017, Defendant Gothard met with Stephen Barton, Executive Vice President, National Production of Defendant Eustis d/b/a Verity Mortgage at SNMC's office to discuss moving to Eustis.

42.     Following their meeting, Defendant Gothard sent Mr. Barton items such as the list of employees in the SNMC Houston Branch and a list of Defendant Gothard's pipeline of loans as well as SNMC's production numbers for the SNMC Houston Branch.

43.     In fact, in April 2017 or earlier, Defendant Gothard agreed to open Defendant Eustis's Houston, Texas office and started searching for office space for Eustis.  On April 19-20, 2017, Defendant Gothard and Mr. Barton exchanged emails regarding potential office spaces and listing those that were Defendant Gothard's "favorites."

44.     Around this time, while still employed as SNMC's Houston Branch Manager, Defendant Gothard found office space for Eustis in the same building where SNMC's Houston Branch was located and negotiated the lease for Defendant Eustis.

45.     In late April 2017, Defendant Gothard met with the employees in his branch and stated that he thought "SNMC was going to shit," and that multiple management level employees, like Collette Horton, who is a Branch Manager in Katy, Texas, were leaving the company, which was not true.

46.     Accordingly, Defendant Gothard told his employees that he was moving to Eustis and opening its Houston, Texas branch, under the name Verity Mortgage.  Further, Defendant Gothard invited most of his employees at the SNMC Houston Branch to join him.

47.     In April and May 2017, during which time Defendant Gothard accepted employment with Eustis, found office space for Eustis, solicited SNMC employees on behalf of Eustis, and worked on loan files that he would close with Eustis, Defendant Gothard was still a

SNMC Branch Manager, being paid by SNMC to supervise employees and work for SNMC's best interest.

48.     In a letter dated May 3, 2017, Defendant Eustis offered employment to SNMC Houston Branch employee Teresa Valentino as a Loan Processor with a start date of May 15, 2017.   In addition, the offer letter advises that Ms. Valentino will be "reporting directly to Donald Gothard, Branch Manager."

49.     When Ms. Valentino received this letter, Defendant Gothard was still a SNMC Branch Manager, supervising Ms. Valentino.

50.     On or around May 4, 2017, Defendant Gothard, in an attempt to solicit Teresa Valentino to resign from SNMC and move to Eustis's employ, exchanged text messages with Ms. Valentino.  Defendant Gothard stated that the "best we can do is 50 bucks per file but you will have to process for other files including builder loans. The 50 will not be paid on my files. And you will also have to do on and outs [sic] when needed. I need a commitment or you tell me you are staying today."

51.     That evening Ms. Valentino, who did not want to leave SNMC, asked the Branch Manager of SNMC's Katy, Texas office if she could work full time there, and was advised that she could.

52.     The following day, on or around May 5, 2017, Ms. Valentino declined Defendant Eustis's job offer and advised Defendant Gothard of her decision to remain employed by SNMC.

53.     After this, Defendant Gothard sent numerous texts and emails to Ms. Valentino requesting information on consumer loan files.

54.    Around this time, Defendant Gothard also began conducting business on Eustis's behalf.  For example, on May 9, 2017, Defendant Gothard advised an appraiser that he ordered five (5) appraisals from her for Eustis, and she should see the request soon.

55.    In addition, Defendant Gothard hired a loan processor for the Eustis branch he was opening and had Defendant Fitzgerald begin training the Eustis loan processor at the SNMC Houston Branch.

56.    Defendant Gothard also began concealing information from Ms. Garofano and interfering with her solicitation and processing of SNMC's consumers.  When a borrower would call for Ms. Garofano, Defendant Gothard would pick up the telephone instead and shut his office door so as to exclude her from conversations with actual and potential borrowers.

57.    On one occasion, a borrower came into the office to see Ms. Garofano. As she was getting up to greet the borrower, Defendant Gothard approached the borrower and said that Ms. Garofano was too busy and could not see him.  Instead, Defendant Gothard led the borrower out of the office and to the Eustis office space Defendant Gothard had leased in the same building.

58.    Around this time, Darryl Plaisance, a regional manager of business development at SNMC, became suspicious that Defendant Gothard was planning to leave SNMC. Mr. Plaisance confronted Defendant Gothard, but Defendant Gothard was adamant that he had no intention of leaving.

59.    On May 15, 2017, Defendant Fitzgerald resigned via email to Defendant Gothard advising that "due to personal issues that we have already discussed, with my family, I have decided that it is best that I resign at this time to take care of family issues."  Defendant Gothard

sent an email to Mr. Plaisance, pretending to be surprised and upset, stating, "[c]all me asap. This just screwed everything up."

60.     Defendant Fitzgerald had actually accepted employment with Eustis a week earlier, on May 9, 2017.  Defendant Fitzgerald began working for Eustis as a Loan Originator once she resigned from SNMC and registered on the National Mortgage Licensing System with Eustis in June 2017.

61.     After Defendant Fitzgerald resigned, SNMC decided to monitor the credit reports for the SNMC Houston Branch. The credit reports showed suspicious activity, such as numerous credit reports pulled for loans that were never funded.

62.     For example, in March 2017, Defendant Gothard requested seventy-two (72) credit reports and of those, twenty-one (21) loans were ultimately funded. In April 2017, this number dropped to fifty-two (52) credit reports requested and nine (9) funded and, in May 2017, only thirty (30) credit reports were requested and only four (4) were funded.

63.     Due to their lingering concerns, on or around May 25, 2017, Mr. Plaisance and Shane Solhtalab, a regional manager at SNMC, met with Defendant Gothard and again confronted Defendant Gothard about whether he was leaving SNMC.  Once again, Defendant Gothard represented that he was not leaving SNMC and explained away the suspicious activity with his credit reports and loan production.  Defendant Gothard even requested that SNMC hire Defendant Gothard's wife, Valerie Gothard, as a loan originator at the SNMC Houston Branch.

64.     At the end of May 2017 through the beginning of June 2017, Defendant Gothard sent numerous emails from his work email address to his personal email address containing voluminous NPI about borrowers.

65.     By way of example, Defendant Gothard sent himself documents for a borrower with the last name of Tarantino, including Mr. Tarantino's paystubs, compensation information and credit card statements.  None of these communications were sent to a secure email address. He sent similar unsecured emails to his personal email account for borrowers including but not limited to the customer names Powell, Warren, Kongovi, and others.

66.     On June 9, 2017, Defendant Gothard resigned from SNMC.  However, Defendant Gothard had already signed and accepted an employment offer letter from Eustis for the position of Branch Manager/Loan Officer on May 8, 2017.  Plaintiff attaches Defendant Gothard's signed offer letter from Eustis hereto as **Exhibit 7**.

67.     When Defendant Gothard resigned, he took the "R Drive," containing all of the NPI for the consumer loans that the SNMC Houston Branch had processed, or was processing.

68.     Ava Nguyen, Loan Originator, also resigned on June 9, 2017 and moved to Eustis's employ.  However, Ms. Nguyen had a Eustis d/b/a Verity Mortgage email address as early as May 30, 2017.

69.     Defendant Gothard gave Jodie Orlando an employment application for Eustis prior to his resignation, and then on June 19, 2017, Ms. Orlando also resigned from SNMC to move to Eustis's employ.

70.     Accordingly, Defendant Gothard, Defendant Fitzgerald, Ms. Nguyen, Ms. Orlando and Defendant Gothard's wife, Valerie Gothard, all work for Defendant Eustis in its Houston office.

71.     After learning that Defendant Gothard resigned, and solicited and took almost all the employees at the SNMC Houston Branch to Eustis, SNMC further reviewed the credit reports generated for the SNMC Houston Branch.  This review showed that only fifteen (15) of

15

the seventy-nine (79) credit reports that Defendant Gothard pulled from April 1, 2017 until his resignation were funded.  In other words, without any justification, Defendant Gothard purposely "held" loans that he had begun to originate while employed with SNMC, in order to carry them over to Eustis where they would fund and where the Employee Defendants and Eustis would benefit financially from them at SNMC's expense.

72.    In addition, the report showed that credit reports for some loans were requested through SNMC and then requested through Eustis. The report also showed that some loans had credit reports pulled through SNMC, but then sat inactive without funding, only to be funded last minute with a rushed closing date.

73.    In May 2017, while Ms. Garofano was out of the office for personal reasons, Mr. Gothard was attempting to divert the loans she was working on for closure at Eustis.  For example, Defendant Gothard advised B. Boyter that he was simply trying to help Ms. Garofano with her loans while she was away and asked Mr. Boyter to resend all of his personal financial documents, which he did.

74.    Mr. Gothard then requested a credit report for Mr. Boyter's loan on May 15, 2017, through Eustis, but Eustis could not close the loan.

75.    Mr. Gothard never advised Mr. Boyter that he did this or was working on Eustis's behalf and intending to close Mr. Boyter's loan with Eustis.

76.    Mr. Boyter did not learn that Defendant Gothard was working for Eustis until Ms. Garofano was back in the office, working with Mr. Boyter again. Mr. Boyter did not find out Defendant Gothard requested his credit report through Eustis until SNMC began investigating this lawsuit.

77.     In the weeks leading up to Defendant Gothard's resignation from SNMC, he began misinforming SNMC consumers that SNMC was merging with Defendant Eustis.  During this time, the Employee Defendants continued to process the loan applications – as if they were working exclusively for SNMC – and consumers had no reason to second-guess the false assertions about a merger.  In reality, the Employee Defendants were processing these loans for the benefit of Eustis.

78.     Borrowers were led to believe that they were continuing to do business with SNMC when, in fact, they are doing business with an entirely separate, unrelated entity that is a competitor of SNMC.

79.     Ms. Garofano and Ms. Valentino remain employed by Defendant SNMC, but the SNMC Houston Branch no longer exists.  Ms. Valentino now works for another branch and Ms. Garofano works from home.

80.     Since Defendant Gothard and the other employees left, Defendant Gothard has taken to Eustis at least ten (10) borrowers that Ms. Garofano was working with at SNMC.  For example, Ms. Garofano lost loans for customers Donalson, Rozell, and Nopprapun. In fact, the borrowers' credit reports show that SNMC initially pulled their credit reports and after Defendant Gothard left, Eustis pulled their credit again and ultimately closed those loans.

81.     Since the Employee Defendants left SNMC, on at least two occasions, Ms. Garofano has asked the Employee Defendants, via email, to send her loan documents a borrower sent to them while the Employee Defendants were at SNMC.  Ms. Garofano requested this information so that she could close the loans for the borrowers.  However, the Employee Defendants refused to provide the loan documents and instead closed the loans through Eustis.

82.     Since Defendant Gothard has been employed by Defendant Eustis, he continues to misinform numerous consumers and potential consumers, as well others in the industry that SNMC merged with Defendant Eustis and/or that SNMC is "going under."

83.     In relation to the processing of one borrower's loan, Ms. Valentino received a payoff statement from a short-term lender, R.D., with whom Defendant Gothard and SNMC had often worked.  However, the payoff statement was addressed to "Verity," Eustis's d/b/a, instead of to "SNMC."

84.     Ms. Valentino immediately called her contact at R.D. to ask her why Verity had been named in place of SNMC.  The R.D. contact stated that she had been told that SNMC had merged with Verity and that she thought the companies were now one and the same.  Ms. Valentino advised her that this was untrue.

85.     Due to the confusion caused by the above described circumstances, R.D. recently advised SNMC that R.D. would be working exclusively with Defendant Gothard at Eustis going forward.

86.     The Employee Defendants' actions have created and will continue to create confusion for SNMC consumers, at least one of whom has indicated that he was under the mistaken belief that his diverted loan had not been removed from SNMC.

87.     While the Employee Defendants were surreptitiously conspiring to steal and divert SNMC's leads, trade secrets, employees, referral sources, loan applications and consumers, they deceptively maintained the façade of trusted employees.

88.     As a result of the Defendants' misconduct, the Defendants continue to financially benefit from marketing and processing loans to SNMC's consumers and from utilizing SNMC's

trade secrets and confidential information, all of which the Defendants unlawfully diverted to Defendant Eustis.

89.     The Employee Defendants' misconduct continues to date, and SNMC is still discovering further misconduct of the Employee Defendants as SNMC's investigation continues.

90.     At all times that Eustis dealt with the Employee Defendants before they left SNMC and joined Eustis, Eustis knew that they were employed by SNMC.

91.     The unlawful conduct detailed above severely damaged SNMC, causing the closure of its Houston, Texas branch and the loss of any significant business presence in that area.

92.     As a result of the above actions, SNMC has suffered and continues to suffer irreparable injury and damages.

### COUNT I
### Violation of the Lanham Act, 15 U.S.C. 1125(a), Against All Defendants

93.     SNMC incorporates all previous paragraphs as though fully stated herein.

94.     The Employee Defendants made material misrepresentations to numerous consumers that the consumers were engaging in transactions with SNMC, and that SNMC would maintain their NPI and originate, price, process, underwrite, close and fund their transactions.

95.     The Employee Defendants also misrepresented to consumers, potential consumers and referral sources that SNMC was merging with Defendant Eustis, concealing the fact that the consumers' loans were being transferred to a separate, competing company.

96.     The Employee Defendants misrepresented to consumers and potential consumers that they were engaging in and undertaking such transactions as representatives and agents in affiliation and association with SNMC, when they were actually working on behalf of Eustis.

19

97.     Further, the Employee Defendants as current agents of Eustis, have made and continue to make misrepresentations that SNMC and Eustis have merged, conceal that the two companies are actually separate competitive entities, and mislead consumers so they are unaware that Eustis is now processing many of the loan files consumers originally applied for and opened with SNMC.

98.     The Employee Defendants made these misrepresentations in promotion of Eustis's competitive business and for the purpose of promoting Eustis's new location in Houston, Texas.

99.     Unbeknownst to SNMC's consumers, the Employee Defendants were originating, processing, underwriting, approving, pricing and funding consumer loans with the intention of diverting them—and, in fact, did so divert them—to competitor Defendant Eustis.   The Defendants continue to make these misrepresentations to consumers for the benefit of Eustis.

100.     This caused and continues to cause confusion among the consumers as to which company was providing them with a mortgage loan.

101.     The Defendants have been unjustly enriched as a direct and proximate result of their wrongful acts, and Plaintiff has suffered damages in an amount not yet fully determined.

102.     As a direct result of Defendants' actions, SNMC has been harmed and continues to be irreparably harmed by the loss of business and goodwill in the marketplace and consumers are harmed through the Defendants' material misrepresentations.

103.     The foregoing acts constitute unfair competition in violation of Section 43(a) of the Lanham Act.

104.     Defendants have acted knowingly, willingly and in conscious disregard of the rights of their consumers, Plaintiff, and the general public.

## COUNT II
## Common Law Tortious Interference with Economic Relations Against All Defendants

105.    SNMC incorporates all previous paragraphs as though fully stated herein.

106.    SNMC had a reasonable expectation of future business relationships with potential consumers who indicated an interest in engaging SNMC's services.

107.    There was a reasonable probability that SNMC and these potential consumers would have entered into one or more contractual relationships because they provided their contact information or submitted applications to SNMC with the goal of obtaining a permanent mortgage loan. Further, many real estate investors who utilize SNMC's services are repeat customers who seek mortgage loans on multiple properties.

108.    By virtue of their former positions of trust and duties with SNMC, the Employee Defendants were aware of the potential business relationship between SNMC and SNMC's loan applicants and potential consumers.

109.    In fact, the Employee Defendants signed written agreements in which they agreed not to take the very acts that they ended up taking in furtherance of their coordinated departure from SNMC.

110.    The Employee Defendants knowingly and intentionally interfered with these prospective relationships by diverting consumers to Defendant Eustis, in many cases without the consumers' knowledge that this was occurring.

111.    The Employee Defendants took these actions while they were employed by SNMC, as well as after the Employee Defendants were employees and agents of Eustis.

112.    Defendant Eustis, namely Stephen Barton, knew that the Employee Defendants were misappropriating SNMC's confidential information and improperly diverting consumers to Eustis and facilitated that misconduct.

113.    The Employee Defendants fraudulently retained SNMC loan files loans and stole SNMC's confidential information, with Eustis's knowledge and encouragement, in order to enrich themselves and injure SNMC which they knew would soon be Eustis's direct competitor in the marketplace.

114.    The Defendants' actions in interfering with SNMC's prospective business relationships were intentional and malicious. Further, the Defendants improperly took advantage of unsecured consumer NPI, which Employee Defendants had failed or refused to secure in the first place, and deceived consumers in order to cripple SNMC's business.

115.    Through the Defendants' actions, the Defendants induced and/or caused a termination or diversion of these expected relationships.

116.    As a direct result of Defendants' actions, SNMC has been harmed and continues to be irreparably harmed in the loss of business and goodwill in the marketplace.

### COUNT III
### Common Law Intentional Interference with Contractual Relations Against All Defendants

117.    SNMC incorporates all previous paragraphs as if stated fully herein.

118.    The Employee Defendants both have enforceable Employee Agreements with SNMC setting forth their obligations to SNMC with respect to the maintenance and non-disclosure of SNMC's confidential information.

119.    The Employee Defendants acknowledge the substantial value of this confidential information to SNMC and agreed not to disclose such information, including information related to SNMC's borrowers, loan applications, loans in process, and borrower and prospective borrowers' applications, records and documents.

120.    The Defendants, through Defendant Gothard and Defendant Fitzgerald, willfully and intentionally usurped the confidential information referenced and described in the Employee

Defendants' Employee Agreements and disclosed it to Defendant Eustis for the benefit and gain of Defendant Eustis.

121.    Defendant Eustis, through its agents, knew that the Employee Defendants were misappropriating SNMC's confidential information and breaching their contractual obligations to SNMC.

122.    SNMC suffered damages, including loss of business, profits and good will.

123.    The Defendants misappropriating this information in violation of the Employee Defendants' agreements was a proximate cause of SNMC's damages.

### COUNT IV
### Common Law Breach of Fiduciary Duty Against the Employee Defendants

124.    SNMC incorporates all previous paragraphs as if fully stated herein.

125.    As employees of SNMC, and pursuant to their Loan Officer Agreements and other agreements with SNMC, the Employee Defendants owed the following fiduciary duties to SNMC:

> a.  A duty to faithfully perform the duties assigned to them, during the term of their employment, not to engage in any other real estate or mortgage related duties or work for competing entities;

> b.  A duty not to disclose or utilize in any manner Plaintiff's Confidential Information for their own benefit and the benefit of others, or to the detriment of Plaintiff;

> c.  A duty not to misuse Plaintiff's Confidential Information except for the express purpose for which the information was provided to them; and

> d.  A duty of good faith and loyalty to Plaintiff.

126.    The Employee Defendants have breached the foregoing duties:

a.  By accessing, converting, utilizing, and disclosing SNMC's consumer NPI for their own benefit and for the benefit of third party competitors, namely Eustis, to the detriment of SNMC;

b.  By soliciting SNMC employees for their own benefit and for the benefit of third party competitors, namely Eustis, to the detriment of SNMC; and

c.  By soliciting or diverting Plaintiff's current and prospective consumers.

127.   All of the above actions were orchestrated and undertaken by the Employee Defendants while they were still employees of SNMC and owed fiduciary duties of loyalty and fair dealing to SNMC.

128.   As a result of the Employee Defendants' multiple willful breaches of their fiduciary duties, Plaintiff SNMC has suffered and will continue to suffer damages and irreparable injury.

**COUNT V**
**Common Law Aiding and Abetting a Breach of Fiduciary Duty Against All Defendants**

129.   SNMC incorporates all previous paragraphs as though fully stated herein.

130.   As more fully detailed above, the Employee Defendants, by virtue of their employment with SNMC, at all times owed a fiduciary duty and a duty of loyalty to SNMC.

131.   The Employee Defendants breached their fiduciary duties and duties of loyalty by diverting consumers to Defendant Eustis, misappropriating trade secrets and soliciting employees, and stealing SNMC's confidential information and consumers for the use and benefit of a third-party competitor, all while remaining employed by SNMC.

132.   Defendant Eustis had knowledge of the Employee Defendants fiduciary duties to SNMC and provided substantial assistance to the Employee Defendants by facilitating such

transactions, and knowingly and willfully taking financial advantage of the Employee Defendants' breach of their fiduciary duties.

133.    In addition, the Employee Defendants knowingly assisted and willfully took advantage of one another's breaches of fiduciary duties.

134.    As a result of the Defendants' actions in aiding and abetting the fiduciary breaches outlined herein, SNMC has been harmed and continues to be irreparably harmed.

## COUNT VI
### Misappropriation of Trade Secrets in Violation of Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. § 134A.001 *et seq.*, as amended, Against All Defendants

135.    SNMC incorporates all previous paragraphs as though fully stated herein.

136.    SNMC derives independent economic value from its lists of potential and actual customers, consumer leads, loan applications and nonpublic consumer information, none of which is generally known, and SNMC took reasonable measures to maintain and protect the secret nature of the information.  As such, they constitute trade secrets under Texas's Uniform Trade Secrets Act.

137.    The Employee Defendants were entrusted with this confidential and proprietary information in the performance of their jobs.

138.    The Employee Defendants improperly and unlawfully accessed and disclosed these trade secrets to Defendant Eustis, and Defendant Eustis utilized such trade secrets in breach of applicable fiduciary duties and duties of loyalty, all to SNMC's detriment.

139.    Unless Defendants are restrained by appropriate injunctive relief, pursuant to the Texas Uniform Trade Secrets Act, their conduct will cause and continue to cause SNMC immediate and irreparable harm for which there is no adequate remedy at law.

140. As a direct result of Defendants' actions, SNMC has been harmed and continues to be irreparably harmed.

## COUNT VII
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, Against All Defendants**

141. SNMC incorporates all previous paragraphs as though fully stated herein.

142. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

143. SNMC's customer lists, customer leads, loan applications and personal consumer information were kept secret by substantial measures undertaken by SNMC to protect the secret and private nature of the information.

144. SNMC's trade secrets are related to products or services used in interstate commerce.

145. The Employee Defendants were entrusted with this confidential and proprietary information in the performance of their jobs.

146. The Employee Defendants improperly and unlawfully accessed and disclosed these trade secrets to Defendant Eustis, which knew or had reason to know that these trade secrets were acquired by improper means.

147. The Defendants utilized such trade secrets in breach of applicable fiduciary duties and duties of loyalty, without SNMC's express or implied consent, all to SNMC's detriment.

26

148.    As a direct result of Defendants' actions, SNMC has been harmed and continues to be irreparably harmed.

## COUNT VIII
### Common Law Breach of Contract Against All Employee Defendants

149.    SNMC incorporates all previous paragraphs as if fully set forth herein.

150.    Plaintiff entered into Loan Originator Agreements with Defendants Gothard and Fitzgerald, in which the Employee Defendants agreed to the aforementioned confidentiality clauses, as consideration for continued employment with SNMC.

151.    In addition, Plaintiff entered into Non-Disclosure Agreements with Defendants Gothard and Fitzgerald, in which the Employee Defendants agreed to the aforementioned terms of non-disclosure of SNMC's confidential information.

152.    Pursuant to these Agreements, the Employee Defendants were contractually obligated not to disclose or misappropriate SNMC's confidential information, as defined therein, to third parties or to utilize that information to their benefit or the benefit of third parties, to the detriment of SNMC.

153.    The Employee Defendants breached their confidentiality obligations to which they agreed, by, *inter alia*, disclosing and misappropriating SNMC's confidential information for their own benefit and the benefit of Defendant Eustis.

154.    As a proximate result of the Employee Defendants' violations of their contractual obligations, Plaintiff has been and will continue to be irreparably injured because it has no adequate remedy at law for the Employee Defendants' actions and because the amount of damages Plaintiff has suffered and will continue to suffer in connection with the solicitation of its employees and the wrongful utilization, disclosure, and misappropriation of its confidential information does not lend itself to exact proof and specificity.

155.    The Employee Defendants will, unless restrained preliminarily and permanently, continue to violate Plaintiff's rights, and they will continue to ignore their contractual duties by using SNMC's confidential information to solicit and/or divert consumers as well as disclosing the same to third parties to the detriment of SNMC, and will continue to cause the loss of the secrecy and the competitive value of the SNMC's confidential information, thereby causing Plaintiff irreparable harm.

156.    Accordingly, a preliminary and permanent injunction restraining and enjoining the Employee Defendants from further violating the terms and covenants of the Employee Defendants' Loan Officer Agreements and Non-Disclosure Agreements is the only remedy that will afford Plaintiff meaningful relief.

157.    The Employee Defendants are further obligated to fully and completely return all of SNMC's confidential information, including all copies, compilations, and excerpts, regardless of the form or embodiment of that information.

158.    Plaintiff is also entitled to a recovery of its damages, to the extent that those damages may be ascertainable, for the several and multiple breaches of the Employee Defendants' contractual duties owed to Plaintiff.

**COUNT IX**
**Common Law Civil Conspiracy Against All Defendants**

159.    SNMC incorporates all previous paragraphs as if fully set forth herein.

160.    The Employee Defendants and Defendant Eustis sought to unlawfully misappropriate SNMC's confidential information and solicit SNMC employees in order to divert consumers and the loans for which they applied to Eustis.

161.    The Employee Defendants and Eustis clearly discussed or otherwise agreed to a course of action to solicit SNMC employees to leave SNMC and misappropriate SNMC's

28

confidential information in breach of the Employee Defendant's contractual obligations and fiduciary duties not to do so, as well as federal and state law.

162.    The Defendants effectuated this objective through Defendant Gothard soliciting employees from SNMC and both Employee Defendants misappropriating SNMC's confidential information, via emails and hard drives, for use on Eustis's behalf to divert consumers and their loans that would have closed with SNMC, for closure at SNMC.

163.    As a proximate result of Defendants' conspiracy to commit these unlawful actions, SNMC has suffered and been harmed and continues to be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, as to all counts and Defendants, Plaintiff respectfully requests that the Court enter judgment in its favor and award the following relief against Defendants:

A. A temporary restraining order, preliminary injunction during the pendency of this action, and a permanent injunction thereafter restraining Defendants, their agents, employees, attorneys, and all others in concert or participation with any of them from:

   i. maintaining, using, disclosing or disseminating any confidential and/or proprietary information of Plaintiff, including all such information the Employee Defendants misappropriated from Plaintiff, were privy to or obtained knowledge of while employed and/or in any capacity providing services for or on behalf of Plaintiff;

   ii. maintaining, using, disclosing or disseminating any personal information of Plaintiff's consumers, including but not limited to, their Social Security numbers, home and business addresses and telephone numbers, income, liability, asset statements, and their account numbers and monetary balances

29

for bank accounts, mortgages, credit cards, investment and retirement accounts; and

   iii.   utilizing, accessing, or reproducing any information the Employee Defendant collected on the "R Drive" related to consumers obtained or engaged while employed by Plaintiff SNMC.

B.  Return of the "R Drive" and all confidential and/or proprietary information of Plaintiff that the Defendants were provided, were privy to or obtained knowledge of while employed and/or in any capacity providing services to or on behalf of Plaintiff SNMC and/or through the employment of the Employee Defendants;

C.  Disgorgement of Defendants' profits in amounts to be proven through expedited discovery, or at the latest at the trial of this matter;

D.  Such actual and nominal damages as may be proven as a result of Defendants' wrongdoing;

E.  Doubling or trebling of actual damages according to the circumstances of the case;

F.  Punitive damages;

G.  Interest;

H.  Costs;

I.  Statutory and contractual attorneys' fees; and

J.  Such other relief as the Court deems just and proper.

6302231v1

**Demand for Jury Trial**

SNMC respectfully requests and demands a jury trial on all issues so triable.

Dated:  September 11, 2017                    Respectfully submitted,

                                             By:     /s/ *Brad Whalen*
                                                     Brad Whalen
                                                     Fed. Bar No. 11127
                                                     Porter Hedges, LLP
                                                     1000 Main Street, 36th Floor
                                                     Houston, Texas 77002
                                                     (t) (713) 226-6692
                                                     (f) (713) 226-6292
                                                     (e) bwhalen@porterhedges.com
                                             *Local Counsel for Plaintiff*
                                             *SecurityNational Mortgage Company*

Of counsel:
Kate Wade
Fed. Bar No. 570234
Porter Hedges, LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
(t) (713) 226-6697
(f) (713) 226-6297
(e) kwade@porterhedges.com

Ari Karen
*Pro Hac Vice admission forthcoming*
OFFIT KURMAN, P.A.
4800 Montgomery Lane, 9th Floor
Bethesda, MD 20814
(t) (240) 507-1740
(f) (240) 507-1735
(e) akaren@offitkurman.com

Katharine T. Batista
*Pro Hac Vice admission forthcoming*
OFFIT KURMAN, P.A.
Ten Penn Center
1801 Market Street, Suite 2300
Philadelphia, PA 19103
(t) (267) 319-1319
(f) (267) 338-1300
(e) kbatista@offitkurman.com

6302231v1

## VERIFICATION

I, Darryl Plaisance, hereby verify that I am a regional manager of business development at SecurityNational Mortgage Company, Plaintiff in the foregoing action, and as such am authorized to make this verification for and on behalf of Plaintiff.  I have read the foregoing pleading and verify that all facts set forth therein are true and correct to the best of my knowledge, information, and belief.  I declare under penalty of perjury under state and federal law that the foregoing is true and correct.

Dated:  September __**7**__, 2017          _____
                                                                   Darryl Plaisance

4824-5315-7709, v. 1

32